[Cite as *Modern Real Estate Invest. v. McIntyre, Kahn & Kruse*, 2011-Ohio-3471.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95870**

## MODERN REAL ESTATE INVEST., ET AL.

PLAINTIFFS-APPELLANTS

vs.

## McINTYRE, KAHN & KRUSE

DEFENDANT-APPELLEE

**JUDGMENT:**
REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-700729

**BEFORE:**  Cooney, J., Sweeney, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**   July 14, 2011
**ATTORNEYS FOR APPELLANTS**

Richard S. Koblentz
Bryan L. Penvose
Koblentz & Penvose, LLC
55 Public Square
Suite 1170
Cleveland, Ohio 44113


**ATTORNEY FOR APPELLEE**

John K. Lind
The Hanna Building, Suite 1040
1422 Euclid Avenue
Cleveland, Ohio 44115


COLLEEN CONWAY COONEY, J.:

{¶ 1}   Plaintiffs-appellants, Modern Real Estate Investments, LLC, Princess Anne, LLC, Daleview, LLC, Lake Villa Real Estate, LLC, and Jamel White (collectively "Modern"), appeal the trial court's granting summary judgment in favor of defendant-appellee, McIntyre, Kahn & Kruse Co., L.P.A. ("MKK").   Finding merit to the appeal, we reverse.

{¶ 2}   As the sole member of Modern Real Estate Investments, LLC, Jamel White ("White") owned and operated four apartment buildings in the greater Cleveland area.   After purchasing the four apartment buildings for a total of $2.4 million, White discovered potential wrongdoing in the form of fraud and collusion on the part of the bank, the appraiser, and the

real estate agent involved in the sale of the buildings. White hired MKK to represent Modern in a suit against the bank, the appraiser, and the agent. *White v. FirstMerit Bank*, Cuyahoga C.P. No. CV-649923.

{¶ 3} White could not afford to pay MKK an hourly fee, so they entered into a contingency fee agreement. The agreement provided in part:

{¶ 4} "CLIENTS hereby retain ATTORNEYS to act on behalf of CLIENT in recovering damages, by settlement, lawsuit or appeal. In consideration for the legal representation of ATTORNEYS contemplated by this contract, and as compensation therefore, CLIENTS agree to pay and hereby assign to ATTORNEYS, one-third (33 1/3%) of any settlement or verdict recovered on behalf of CLIENTS, including any cash recovery and/or present day value obtained by the restructuring or refinancing of CLIENT'S lending agreements and/or personal guarantees."

{¶ 5} During discovery, MKK and FirstMerit had two separate appraisers re-evaluate the estimated worth of the buildings at the time White purchased them. MKK's appraiser estimated that the buildings had been worth at $1,455,000, while FirstMerit's appraiser estimated their worth $1,460,000. At the time of the suit, Modern still owed nearly $2 million on the loans with FirstMerit.

{¶ 6} The matter was eventually settled out of court. FirstMerit agreed to pay Modern $150,000, while the appraiser and the real estate broker agreed to pay Modern $100,000 each, for a total cash settlement of $350,000.

{¶ 7} After the settlement agreements were reached, Modern approached MKK to pay the firm one-third of the settlement amount. However, MKK sought to collect not only one-third of the $350,000 cash settlement, but also one-third of the so-called "debt relief" that Modern had received. MKK claims that pursuant to the settlement agreement, Modern gave FirstMerit the deeds to the apartments in exchange for $150,000 *and* $522,971.94 in "debt relief," for a total of $672,971.94. The debt relief figure is calculated by subtracting the newly appraised actual value of the apartment buildings (FirstMerit's appraisal) from the outstanding balance on Modern's loan.

{¶ 8} Modern filed suit against MKK in August 2009, seeking a declaratory judgment. Modern argued that MKK was entitled to one-third of the cash settlement received in the aforementioned litigation but was not entitled to one-third of the "debt relief." Modern moved for summary judgment. MKK filed counterclaims and moved for summary judgment on the identical issue, arguing the debt relief was a part of the full value of the settlement.

{¶ 9} The trial court granted summary judgment to MKK, finding that based on the plain language of the fee agreement, MKK was entitled to one-third of the $522,971.94 in debt

relief, as well as one-third of the cash settlement. The court also found that the total of $290,987.17 in attorney's fees was neither unreasonable nor excessive.

{¶ 10} Modern now appeals, raising three assignments of error.

Summary Judgment

{¶ 11} In its first assignment of error, Modern argues that the trial court erred in granting summary judgment to MKK.

{¶ 12} Appellate review of summary judgments is de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. The Ohio Supreme Court stated the appropriate test in *Zivich v. Mentor Soccer Club* (1998), 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201, as follows:

{¶ 13} "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264, 273-274."

{¶ 14} Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E); *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197.

{¶ 15} As an initial matter, we note that in the instant case, the issue of whether the contingency agreement is unambiguous is not an issue. Modern and MKK stipulated that the agreement is clear and unambiguous.

{¶ 16} Modern argues that the trial court erred in granting summary judgment to MKK because the language of the contingency agreement does not award one-third of any debt relief to MKK. Whereas, MKK claims that it is entitled to one-third of the debt relief it negotiated on behalf of Modern. MKK claims that the "debt relief" constitutes "refinancing and restructuring" pursuant to the contingency fee agreement. The trial court agreed with MKK and found that the contingency agreement entitled MKK to "any settlement or verdict recovered" and that "debt relief" constitutes part of the settlement. We disagree.

{¶ 17} The contingency agreement states, in pertinent part, that MKK is entitled to one-third "of any settlement or verdict recovered on behalf of CLIENTS, including any cash recovery and/or present day value obtained by the restructuring or refinancing of CLIENT'S lending agreements and/or personal guarantees." Nowhere in this agreement is any mention

made of debt relief or forgiveness. MKK's calculation of the $522,971.94 of "debt relief" is fairly complicated. If MKK had foreseen "debt relief" as part of the negotiated settlement, it was well within its control to include such language in the contingency agreement it drafted and to provide a formula for its calculation. However, the contingency agreement does not contain clear language by which we can determine that the parties mutually agreed to include the potential for "debt relief" in the calculation of applicable attorney fees.

{¶ 18} In addition, MKK did not "refinance" or "restructure" Modern's loan with FirstMerit. The settlement agreement with FirstMerit states, in pertinent part:

{¶ 19} "5. Upon the actual recording of the Quit Claim Deeds by FirstMerit, FirstMerit agrees to release all Plaintiffs from their obligations under the promissory notes referenced in the recitals of this Agreement, including all deficiencies, and to release Jamel M. White of all obligations under the guaranties referenced in the recitals of this Agreement, including all deficiencies."

{¶ 20} No mention is made regarding the forgiveness of the outstanding balance on the loan, nor is any mention made regarding "refinancing" or "restructuring." In addition, no mention is made of the remaining debt minus the newly appraised estimated value of the apartments.

{¶ 21} Refinancing is defined in Black's Law Dictionary as "[a]n exchange of an old debt for a new debt, as by negotiating a different interest rate or term or by repaying the

existing loan with money acquired from a new loan." To restructure is defined by Webster's Dictionary as "to change the makeup, organization, or pattern of." The online Business Dictionary defines loan restructuring as the:

{¶ 22} "Process by which an institutional lender (such as a bank) modifies or relaxes the terms of a loan agreement to minimize the eventual loss by accommodating a borrower who is financially incapable of meeting them. According to the US Financial Accounting Standards Board standard 15 (FASB 15) restructuring of troubled loans (where no payment has been made for 90 days or more) is classified as either a loan where (1) the borrower is required to pledge additional assets as collateral, or (2) the terms of the loan agreement are modified to include, among other changes, (a) provision for outright foreclosure on the loan without applying to the courts, (b) reduction in the applicable interest-rate, (c) extension of the loan period, (d) acceptance of interest-only payments for a specified period, and/or (e) forgiveness of a part of the principal and/or accrued interest amount."

{¶ 23} Each of these definitions supports the conclusion that releasing an individual or a company from obligations under a loan or promissory note does not constitute refinancing or restructuring. Releasing a loan obligation terminates the outstanding balance, whereas, refinancing or restructuring indicates that the loan is ongoing in a modified form. The settlement agreement clearly illustrates that the intention was to release Modern of all "obligations" and "deficiencies" associated with the promissory notes for the apartment

buildings. Had the loans been restructured or refinanced they would still exist. FirstMerit terminated the loans and Modern's obligations in exchange for the deeds and the cash settlement.

{¶ 24} Thus, we find that Modern's settlement agreement does not contain any award of debt forgiveness, nor does the contingency agreement contain any language regarding debt relief, loan forgiveness, or outright release. Therefore, no fee can be awarded from the termination of Modern's obligations to FirstMerit, and the only fee to which MKK is entitled is one-third of the $350,000 cash settlement Modern received.

{¶ 25} Accordingly, the first assignment of error is sustained. Thus, the remaining assignments of error are moot. See App.R. 12(A)(1)(c).[1]

Judgment reversed.

This cause is reversed and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellants recover of said appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

---

[1]The remaining assignments of error are set forth in the appendix.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
COLLEEN CONWAY COONEY, JUDGE

JAMES J. SWEENEY, P.J., and
SEAN C. GALLAGHER, J., CONCUR

## APPENDIX

ASSIGNMENT OF ERROR #2: THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DETERMINING THAT THE ATTORNEYS FEES SOUGHT BY AND AWARDED TO APPELLEE MKK WERE NEITHER UNREASONABLE NOR EXCESSIVE.

ASSIGNMENT OF ERROR #3: THE TRIAL ERRED IN GRANTING PREJUDGMENT INTEREST.